UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ANNA M. MARTIN, )
    Plaintiff, )
     )
v. ) Case No. 1:11-cv-97
     ) (Collier/Carter)
MICHAEL J. ASTRUE )
Commissioner of Social Security )
    Defendant )

REPORT AND RECOMMENDATION

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion for Judgment on the Pleadings (Doc. 7) and defendant's Motion for Summary Judgment (Doc. 10).

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying the plaintiff a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(I) and 423.

For the following reasons, I RECOMMEND the decision of the Commissioner be AFFIRMED.

Plaintiff's Age, Education, and Past Work Experience

Plaintiff was born on October 9, 1960. She has a high school education and one year of college (Tr. 27). She was 42 years old at the time of her disability onset date, which is defined as a "younger person" under 20 C.F.R. §404.1563(c) (Tr. 25). Plaintiff has past work experience as a jewelry manager, restaurant manager, office manager, and insurance agent (Tr. 117).

## Claim for Benefits

Plaintiff applied for disability insurance benefits ("DIBs") in May 2008, alleging she became disabled on February 1, 2006, due to arthritis, fibromyalgia, Sjogren's syndrome, right knee bone spurs and panic attacks (Tr. 95, 116). At the administrative hearing, plaintiff amended her onset date to February 1, 2002. She is classified as a "younger person" under 20 C.F.R. §404.1563(c) (Tr. 25). Her application was denied initially and on reconsideration (Tr. 72, 79). A hearing was held before Administrative Law Judge (ALJ) Edward Snyder on October 16, 2009 (Tr. 20-46). Plaintiff testified in the presence of counsel. James Flynn, a vocational expert, also testified. On January 22, 2010, the ALJ found Plaintiff was not disabled because she could perform her past relevant work as an insurance agent (Tr. 8-19). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review (Tr. 1-3). Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g).

## Standard of Review - Findings of the ALJ

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a

2

listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Secretary of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a prima facie case she cannot return to her former occupation, the burden shifts to the Commissioner to show there is work in the national economy which the claimant can perform considering her age, education and work experience. *Richardson v. Secretary v. Secretary of Health & Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review to be applied by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side of the issue, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for the Commissioner's merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary of Health & Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

3

After considering the entire record, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2007.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of February 1, 2002, through her date last insured of March 31, 2007 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine, cervical spondylosis, and lumber radiculitis (20 C.F.R. 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform less than light work as defined in 20 CFR 404.1567(b). Specifically, the claimant suffers from postural limitations which allow her to only occasionally perform tasks which require balancing, stooping, kneeling, crouching, and crawling. The claimant must avoid performing tasks which require the climbing of stairs, ropes, ladders, and scaffolds. The claimant also suffers from manipulative limitations which allow her to use her left upper extremity only occasionally when performing tasks which require reaching. Lastly, the claimant can only perform work which allows her the option of alternating between periods of sitting and standing at one hour intervals.

6. Through the date last insured, the claimant was capable of performing past relevant work. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from February 1, 2006, the alleged onset date, through March 31, 2007, the date last insured (20 C.F.R. 404.1520(f)).

(Tr. 10-14).

## Issue Raised

Whether substantial evidence supports the finding of the administrative law judge that Plaintiff was not disabled on or before March 31, 2007, the date her insured status expired, because she could perform her past relevant work as an insurance agent.

Relevant Facts

I. Medical Evidence Prior to Expiration of Plaintiff's Insured Status (March 31, 2007)

On October 25, 2004, Plaintiff visited Dr. Hodges at the Center for Sports Medicine & Orthopaedics due to hand swelling and pain in her back and leg (Tr. 176). She stated the back and leg pain had been present for the preceding three years despite physical therapy and a cortisone injection in 2001. She complained of numbness in hands and feet and loss of bladder control (Tr. 176). Upon examination, Dr. Hodges found Plaintiff had decreased sensation in the left L4-5 dermatome and muscle tenderness on palpation. The doctor commented Plaintiff was "hypersensitive on exam." The remainder of the exam was normal, revealing a normal range of lumbar motion, normal reflexes, full 5/5 strength in the lower extremities, normal straight leg raising, a normal gait and normal heel/toe walking. Dr. Hodges ordered lumbar and cervical spine x-rays, which showed a loss of disc height from L4-S1 and multilevel cervical disc height changes. (Tr. 177). Dr. Hodges also reviewed a June 2004 MRI, which revealed mild degenerative changes at L4-5 and degenerative changes with a posterior disc bulge, facet arthropathy and foraminal encroachment at L5-S1 (Tr. 178). He recommended physical therapy and three lumbar epidural steroid injections to avoid surgical intervention. He scheduled a follow-up visit (Tr. 178).

In March 2005, Plaintiff returned to Dr. Hodges and underwent the injections as suggested, stating she felt "slightly better" since the last visit. However, she also stated she "rarely" took pain medication, "maybe one every two weeks." She stated her pain increased with both activity and remaining in one position for a prolonged period but it abated if she changed positions frequently. Dr. Hodges recommended a new MRI of the lumbar spine, which

5

showed disc dessication, a mild disc bulge and some facet arthopathy but no significant neural foraminal or central canal stenosis at L4-5. (Tr. 182). The MRI also showed a moderate disc bulge and facet joint arthropathy with mild to moderately severe neural foraminal encroachment but no significant central canal stenosis at L5-S1. At L4-5 there was a mild disc bulge and some facet arthropathy but no significant neural foraminal or central canal stenosis. At L5-S1 there was moderate disc bulge resulting in mild right neural foraminal encroachment and moderately severe left sided neural foraminal encroachment. There was no significant central canal stenosis. Facet joint arthropathic change was seen (Tr. 183-184).

In April 2005, Plaintiff rated her pain 4 out of 10 and reported she was not taking any pain medication (Tr. 185). An exam revealed normal straight leg raising and was otherwise unremarkable (Tr. 185). Dr. Hodges reviewed the recent MRI and stated it was "[u]nchanged from the previous exam" (Tr. 185). He discussed treatment options with Plaintiff, but she was "not interested in surgery" (Tr. 185).

On May 25, 2005, Plaintiff visited Dr. Bonvallet's office and provided a medical history but left without being seen by the doctor (Tr. 157, 161). She said she did not complete the EMG test, which requires the insertion of needles, because it was too painful (Tr. 160, 178). She also noted Dr. Hodges recommended surgery, which she declined. Plaintiff returned to Dr. Bonvallet's office on May 31, 2005, complaining of back pain but denying any pain or numbness in her legs. She reported Dr. Shah referred her to Dr. Hodges and ordered an EMG of her legs because of lower extremity cramping (Tr. 160). She stated she was working in insurance sales at the time (Tr. 157). An exam revealed decreased ankle reflexes and a limited range of lumbar motion but normal knee reflexes, a normal gait and normal heel/toe walking (Tr. 157, 159). Dr.

Bonvallet ordered lumbar x-rays, which showed disc space narrowing at L4/5 and degenerative disc disease at L5/S1 (Tr. 159). He reviewed the MRI, discussed treatment options and recommended a discogram (Tr. 159).

On November 4, 2005, Plaintiff saw Dr. Knapp "for a third opinion regarding spine surgery that had been recommended by two local orthopedic surgeons" (Tr. 162). She alleged chronic widespread pain. General and neurological exams were determined to be "essentially benign," and Plaintiff "denie[d] any low back pain" (Tr. 162). Dr. Knapp concluded Plaintiff had "features" of fibromyalgia but "certainly other co-morbidities may need to be taken into account" (Tr. 163).

There is no medical evidence as to Plaintiff's condition during the period from November 5, 2005 through February 21, 2007.

On February 22, 2007, Plaintiff saw Dr. Kern due to pain in her back, leg and arm and numbness and tingling in her legs and arm which began in 2001 (Tr. 173). Plaintiff stated her pain worsened in December 2006 after packing boxes. It was aggravated by staying in one position too long and improved with medication (Tr. 173). A neurological exam revealed a normal gait, simplicity in heel-toe walking, normal straight leg raising, brisk, symmetrical reflexes and no muscle weakness (Tr. 174). Dr. Kern ordered an MRI, which showed disc protrusion at L3/4 with moderate right neural foraminal stenosis and a disc/osteophyte complex at L4/5 with neural foraminal stenosis that was mild on the left and moderate on the right. His impression was back pain, lumbar spondylosis and pain in the bilateral lower extremities of unclear etiology. (Tr. 171, 175).

On February 27, 2007, five days after her visit with Dr. Kern, Plaintiff visited Dr. Shah,

complaining of low back and left shoulder pain (Tr. 207). Dr. Shah's examination showed a limited range of left shoulder motion and "osteoarthritic changes of the hands remain[ed] unchanged" (Tr. 207). Dr. Shah ordered an MRI of the left shoulder and prescribed pain medication (Tr. 208). The MRI showed osteoarthritis of the glenohumeral joint of the shoulder (Tr. 205). On March 14, 2007, a left shoulder arthrogram revealed a small osteophyte (spur) in the left humeral head (Tr. 203). Plaintiff's DIB insured status expired about two weeks later on March 31, 2007 (Tr. 98).

II.     Medical Evidence After Expiration of Plaintiff's Insured Status

On April 24, 2007, Dr. Kern stated the recent MRI showed "degenerative changes," but it was "not well evaluated on the CD." He requested hard copies of the MRI (Tr. 169). Thereafter, Plaintiff received a lumbar epidural steroid injection, as ordered by Dr. Kern, and it "minimally improved" her back pain (Tr. 167, 170). Dr. Kern subsequently reviewed the hard copies of the February 22, 2007 MRI and stated it showed "some mild degenerative changes at L3/4 and L4/5 [and] [t]hese are out of proportion to the scope of the patient's complaints" (Tr. 167). Dr. Kern opined Plaintiff was not a good candidate for surgery, and he recommended pain management with Dr. Dreskin and a "quick-draw brace" (Tr. 167-68).

On April 30, 2007, Plaintiff received a steroid injection in her left shoulder. Plaintiff was instructed to "go easy" on her left shoulder for a "couple of days," and then do left shoulder stretching and range of motion exercises. Dr. Shah noted Plaintiff did not want to attend physical therapy (Tr. 202). Plaintiff subsequently told Dr. Shah her shoulder was "much better after injection." She complained of stiffness and aches in her hands, and an exam revealed

8

"unchanged" osteoarthritic changes in Plaintiff's hands, but normal ranges of motion in all joints (Tr. 199).

On July 14, 2007, Plaintiff saw Dr. Dreskin, a pain management specialist (Tr. 234). An exam revealed limited ranges of lumbar flexion and extension, a "slightly antalgic" gait, "some" difficulty with heel/toe walking, positive straight leg raising at 60 degrees, "somewhat diminished strength on plantar flexion and dorsiflexion in the bilateral lower extremeties" (Tr. 236). Plaintiff had normal sensation and there was no mention of any reflex loss or muscle atrophy (Tr. 236). Dr. Dreskin prescribed pain medication and reviewed an exercise program with her (Tr. 236-37). Plaintiff also received lumbar epidural steroid injections in August and September 2007 from Dr. Dreskin (Tr. 246-50). In October 2007 a follow-up exam by Dr. Shah revealed normal ranges of motion, but osteoarthritis in the hands. His impression/diagnosis included low back pain and polyarthralgia (Tr. 198).

Plaintiff saw Dr. Banks on January 2, 2008, due to leg pain and back pain of about 7 years' duration. She came to investigate "the possibility of surgical options to improve her pain" (Tr. 189). An exam was unremarkable, revealing a normal gait, normal heel/toe walking, normal ranges of neck and shoulder motion, normal 5/5 strength in the upper and lower extremities, normal straight leg raising and normal reflexes (Tr. 189-90). Dr. Banks stated, "from a surgical standpoint, I fe[lt] the likelihood of helping her significantly [wa]s quite low, although I did suggest she undergo a discogram to evaluate whether or not these degenerative discs are contributing to her pain." However, Plaintiff was "not interested in undergoing a discogram or lumbar spine surgery." Dr. Banks suggested a "vigorous physical therapy and exercise program and anti-inflammatory medications" (Tr. 190). On January 8, 2008, about a week later, Plaintiff

9

had increased back, right knee and right hand pain, but an exam by Dr. Shah revealed a "more or less normal" range of motion in all joints, and her hands were "unchanged." Dr. Shah reviewed hand x-rays, which showed medial compartment narrowing, but no chondrocalcinosis or erosive change (Tr. 195). Dr. Shah diagnosed "Sjorgren's syndrome, improved," right knee pain and polyarthralgia. (Tr. 195).

Plaintiff returned to Dr. Shah in April 2008, but there did not appear to be any significant changes. His impressions were Synovitis, knee pain and osteoarthritis of the hands (Tr. 193). In July 2008 Plaintiff complained her hands and feet were cold, and her left shoulder had begun to hurt a lot (Tr. 191-92). The same month, she saw Dr. Alvarez for a medication refill, complained of left shoulder pain and requested an injection. His handwritten notes are not legible (Tr. 211).

On August 11, 2008, Joe Allison, M.D., reviewed the record and opined Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, sit for six hours in an eight-hour day, and stand/walk for six hours in an eight-hour day, but could only frequently (rather than constantly) reach with her left arm/shoulder (Tr. 218-219). He noted that there was no treating source who set forth Plaintiff's physical capacities (Tr. 222). In reaching his conclusion, Dr. Allison considered the physical exams from February 2007 along with the lumbar and left shoulder MRIs from February and March 2007, respectively (Tr. 223). James Moore, M.D. subsequently, on October, 23, 2008, reviewed the record and agreed with Dr. Allison's opinions. Dr. Moore noted Plaintiff's allegation of worsening of the condition but noted that this occurred after the Date Last Insured of March 2007 (Tr. 224).

More than one year later, in October 2009, Dr. Alvarez opined Plaintiff could only occasionally sit, stand and walk. In addition, Plaintiff could occasionally-to-never push and

10

drive, and could never pull or lift. (Tr. 253). Dr. Alvarez noted he first saw Plaintiff in 2004, but opined Plaintiff became unable to work in 2002 (Tr. 252-53).

III.     Testimony from ALJ Hearing

During the October 16, 2009 hearing, Plaintiff amended her alleged disability onset date from February 1, 2006, to February 1, 2002 (Tr. 23-25). She testified her back pain was her worst impairment (Tr. 28). She stated she no longer drove (Tr. 32). She estimated she could sit for one hour at a time, walk ten feet and lift five pounds (Tr. 37). At home, she typically did the laundry, vacuuming and sweeping "with help," cooked twice a week, and did "some dusting, just light things" (Tr. 37-38). She initially stated she did "a whole lot of nothing" during the day but then stated "I mean I do lots. Housework, what I can do. And I try to stay busy walking and feeding my birds" (Tr. 40). She said she was out on the porch "a lot," talked to people on the phone "a lot," and had a lot of friends who came over to visit (Tr. 40).

James Flynn, the vocational expert, classified Plaintiff's job as an insurance agent as light, skilled work (Tr. 43). Mr. Flynn was asked to assume the existence of an individual of Plaintiff's age, who had her education and work experience (Tr. 44). This individual could perform light work, but needed to alternate positions every hour and could not climb ladders, ropes or scaffolds, or constantly reach with the left upper extremity (Tr. 44). Mr. Flynn testified this individual could perform Plaintiff's past relevant work as an insurance agent (Tr. 44-45). Mr. Flynn testified his testimony was consistent with the Dictionary of Occupational Titles (Tr. 45).

## Analysis

In following the five-step inquiry laid out by the SSA, the ALJ first found Plaintiff had

11

not engaged in substantial gainful activity. Second, he found Plaintiff's impairment to be severe but not to belong to the Listing of Impairments of 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Tr. 10-11). Third, the ALJ determined Plaintiff had the RFC to perform light work permitting her to alternate sitting and standing every hour and did not require her to climb ladders, ropes or scaffolds or reach more than occasionally with the left upper extremity (Tr. 11). Fourth, the ALJ found Plaintiff was not disabled, because she could perform her past relevant work both as she performed it and as that work is performed generally in the national economy (Tr. 14).

As stated above, this Court must defer to the ALJ's ruling if it was based upon substantial evidence. For reasons that follow, I conclude there is substantial evidence to support the Decision of the Commissioner.

First, the opinions of both Drs. Allison and Moore support the conclusion reached by the ALJ. Dr. Allison indicated Plaintiff retained the capacity to occasionally lift twenty pounds, frequently lift ten pounds, sit for six hours in an eight-hour day, stand or walk for six hours in an eight-hour day but could only frequently (rather than constantly) reach with her left arm/shoulder (Tr. 218-19). Dr. Allison based his conclusions upon a review of the physical exams from February 2007 and MRIs of the lumbar region and left shoulder from February and March 2007. These exams and MRIs comprise the available medical evidence collected at the latest point prior to the expiration of Plaintiff's insured status, thereby making them the most probative evidence of her condition as it existed at the conclusion of her insured status. Dr. Moore agreed with Dr. Allison's assessment and noted that other evidence of record after the Date Last Insured appeared to be a worsening of Plaintiff's claims after that date (Tr. 224). Further, as Dr. Allison noted, no treating source ever set forth Plaintiff's physical capacities or limitations.

Second, the ALJ's decision is supported by Dr. Kern's reports (Tr. 167, 173-75). Plaintiff saw Dr. Kern on February 22, 2007, about one month before her insured status expired. (Tr. 173). Plaintiff rated her back pain "at 7 out of 10," complained of numbness and tingling in her legs and left arm, and said she had difficulty walking (Tr. 173). She noted her pain increased in December 2006 after she packed boxes, stated that her pain was increased by staying in one position too long, and noted that the pain improved with medication (Tr. 173). A neurological exam was unremarkable, and revealed a normal gait, that Plaintiff could heel and toe walk easily, that Plaintiff had normal straight leg raising, brisk, symmetrical reflexes, and no muscle weakness (Tr. 174). Dr. Kern ordered an MRI, which revealed disc protrusion at L3-4 with moderate right neural foraminal stenosis and a disc/osteophyte complex at L4/5 with neural foraminal stenosis that was mild on the left and moderate on the right (Tr. 171). Dr. Kern reviewed the MRI report, and stated that it showed "some mild degenerative changes at L3/4 and L4/5. These were assessed by Dr. Kern to be out of proportion to the scope of the patient's complaints" (Tr. 167).

Next, in assessing the credibility of Plaintiff's pain complaints, the ALJ also considered other factors, in addition to Dr. Kern's opinion that Plaintiff's complaints were out of proportion to the MRI findings (Tr. 12-13). The ALJ considered Plaintiff's allegations concerning her complaints, the objective examination findings (including Dr. Banks' January 2008 exam findings), the MRI findings and Plaintiff's daily activities. He also considered her treatment history which included the fact that she did not seek treatment from November 2005 until February 2007, shortly before her insured status expired. He further considered that her treatment was conservative in nature, and questioned her poor earnings history prior to the time

13

she alleged disability as possibly raising the question of whether her impairments were the reason for her not working (Tr. 13).

Finally, the ALJ considered the requirements of Plaintiff's past relevant work as an insurance agent, and found that Plaintiff could perform that job as she performed it, and as it was performed in the national economy (Tr. 14). The vocational expert testified that an individual of Plaintiff's age, who had her education and past work experience, and who could perform light work, but needed to alternate positions every hour and could not climb ladders, ropes or scaffolds, or constantly reach with the left upper extremity, could perform Plaintiff's insurance agent job as it was typically performed in the national economy (Tr. 44-45). The vocational expert also testified that a person with those same vocational factors and RFC could perform Plaintiff's job as she performed it (Tr. 44-45). I conclude that the reasons given by the ALJ are based on substantial evidence found in the record.

Plaintiff cites *Lichter v. Bowen* 814 F.2d 430 (7th Cir. 1987) and *Willbanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301 (6th Cir. 1988), and argues that "it is erroneous to make a diagnosis just on the date of the examination" and "it is erroneous to determine that disability cannot be established prior to the date of diagnosis." (Doc. 6, Plaintiff's. Brief at p. 4). However, as the Commissioner argues, the ALJ did not base his findings and conclusions on the date that any particular diagnosis was made. A mere diagnosis provides little, if any, information about the severity of an impairment. *See Young v. Secretary of Health and Human Services*, 925 F.2d 146, 151 (6th Cir. 1990); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("mere diagnosis of arthritis ... says nothing about the severity of the condition"). A mere diagnosis does not itself identify any functional limitations that may flow from that impairment. Although Plaintiff notes

14

that she had a longstanding "problem," this fact was undisputed.  The issue was whether the longstanding problem, i.e., primarily her back pain, rendered her disabled on or before March 31, 2007, the date her DIB insured status expired.  Although evidence after the date last insured can be relevant to the extent of disability prior to the date of the actual examination, in this case there is a specific opinion of Dr. Allison which noted that other evidence of record after the Date Last Insured appeared to be a worsening of Plaintiff's claims after that date (Tr. 224).  I conclude there is substantial evidence to support the finding of the ALJ that any worsening of the condition after the Date Last Insured did not establish disability prior to that time.

Plaintiff also argues the ALJ "failed to properly follow the instructions" of Social Security Ruling (SSR) 83-20 (Doc. 6, Plaintiff's Brief at p. 4).  However, SSR 83-20 is inapplicable to this case.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997).  In *Key*, the Sixth Circuit agreed with the Commissioner's argument that SSR 83-20 applies only where the ALJ finds the claimant was disabled and it is necessary to determine when the disability began.  The *Key* court explained that "[s]ince there was no finding that the claimant is disabled as a result of his mental impairment or any other impairments or combination thereof, no inquiry into onset date is required. The only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status, and we agree that the ALJ correctly determined he was not." *Id.*  Here, as in *Key*, the ALJ did not find the claimant was disabled.  Thus, SSR 83-20 is inapplicable.

15

<u>Conclusion</u>

For the reasons stated herein, I conclude there is substantial evidence to support the conclusion of the ALJ and I therefore RECOMMEND the Commissioner's decision be AFFIRMED.

I further RECOMMEND defendant's Motion for Summary Judgment (Doc. 10) be GRANTED, and plaintiff's Motion for Judgment on the Pleadings (Doc. 7) be DENIED and the case be DISMISSED.[1]

S/*William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).